In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 24-1811

GRAND TRUNK CORPORATION, *et al.*,

*Petitioners,*

*v.*

SURFACE TRANSPORTATION BOARD and UNITED STATES OF
AMERICA,

*Respondents,*

*and*

NATIONAL INDUSTRIAL TRANSPORTATION
LEAGUE, *et al.*,

*Intervening Respondents.*

———————————

Petition for Review of a Final Rule of the
Surface Transportation Board.
No. EP 711 (Sub-No. 2)

———————————

ARGUED JANUARY 16, 2025 — DECIDED JULY 8, 2025

———————————

Before SCUDDER, KIRSCH, and LEE, *Circuit Judges*.

SCUDDER, *Circuit Judge*. Before us is a petition challenging a Final Rule promulgated by the Surface Transportation Board following a notice-and-comment period. At its most basic level, the Final Rule allows a railway shipper or receiver to request what the Rule calls a "reciprocal switching agreement"—a regulatory tool the Board can use to require a rail carrier that has a monopoly over a certain rail line to compete with another carrier for particular rail traffic.

Several rail carriers contend that the Final Rule exceeds the Board's statutory authority under the Staggers Rail Act of 1980, the statute in which Congress granted the agency authority to prescribe reciprocal switching. The carriers also argue that specific aspects of the Final Rule exceed the Board's ancillary powers conferred by its enabling statute and, separately, are arbitrary, capricious, and unsupported by the record.

By its terms, the process the Final Rule prescribes to obtain a reciprocal switching agreement does not require a determination by the Board that an existing carrier's rail service is inadequate. Because we interpret the Staggers Rail Act to require such a finding, this shortcoming compels us to conclude that the Rule exceeds the Board's statutory authority. So we grant the petition and vacate the Final Rule.

## I

### A

We begin with the commercial context that underlies this dispute. The United States rail system is expansive. Spurred by Manifest Destiny, the California Gold Rush, and the Civil War, Americans began exploring ways to connect the nation

by rail in the middle of the nineteenth century. See *Leo Sheep Co. v. United States*, 440 U.S. 668, 670–77 (1979). A transcontinental railroad, many believed, would "bind together the widely separated parts of our common country, and furnish a cheap and expeditious mode for the transportation of troops and supplies." *United States v. Union Pac. R.R.*, 91 U.S. 72, 80 (1875).

In 1862 Congress passed and President Lincoln signed into law "[a]n Act to aid in the Construction of a Railroad and Telegraph Line from the Missouri River to the Pacific Ocean." Act of July 1, 1862, ch. 120, 12 Stat. 489. Construction of the first transcontinental railroad began the next year and opened for service in 1869. From there progress abounded. More than 600 freight rail carriers operate in the United States today, forming an integrated network that spans nearly 140,000 miles of track across the country. See *Overview of America's Freight Railroads*, Ass'n of Am. R.Rs. 1 (Mar. 2020), https://www.aar.org/wp-content/uploads/2018/08/Overview-of-Americas-Freight-RRs.pdf. In 2023 alone, freight rail contributed $233.4 billion to the national economy. See *Freight Rail History*, Ass'n of Am. R.Rs. 10, https://www.aar.org/wp-content/uploads/2020/07/AAR-Chronology-Americas-Freight-Railroads-Fact-Sheet.pdf (last visited July 7, 2025).

The Surface Transportation Board is the federal agency tasked by Congress with regulating freight rail transportation. The Board categorizes rail carriers into three classes, Class I, Class II, and Class III, based on each carrier's annual operating revenue. Class I rail carriers generate the most revenue and Class III carriers the least.

B

This dispute arises out of concerns about the service performance of Class I rail carriers. Like many aspects of the American economy, railroads were not immune from the workforce challenges of the COVID-19 pandemic. In April 2022, citing widespread concern about service problems with several Class I carriers, the Board convened a two-day hearing to explore and address issues related to the reliability of the national rail network. See Notice of Public Hearing, 87 Fed. Reg. 22009 (Apr. 13, 2022). The Board then required several Class I carriers to submit service recovery plans explaining the specific actions each carrier planned to take to improve its service. See *Urgent Issues in Freight Rail Serv.*, No. EP 770 (Sub-No. 1), 2022 WL 1442915 (S.T.B. May 6, 2022).

In time the Board determined that incentivizing Class I carriers to achieve and maintain higher service levels required further regulatory action. So the Board issued a notice of proposed rulemaking, seeking comment on a set of new regulations that sought to improve service by increasing competition. See Reciprocal Switching for Inadequate Service, 88 Fed. Reg. 63897 (proposed Sept. 18, 2023).

After receiving and considering a significant number of comments to the proposed rule, the Board promulgated the Final Rule now before us: Reciprocal Switching for Inadequate Service, 89 Fed. Reg. 38646 (May 7, 2024) (codified at 49 C.F.R. pt. 1145).

C

The Final Rule and its accompanying regulations establish procedures through which a shipper or receiver can request, and the Board in turn can prescribe, a reciprocal switching

agreement. How this scheme works requires some unpacking.

Unlike motor freight, which utilizes government-maintained roadway infrastructure, rail freight operates largely on infrastructure privately owned and maintained by railroad companies. So, continuing with the analogy, while one trucking company cannot exclude another from using interstate highways funded by taxpayer dollars, a rail carrier generally can refuse to allow another carrier to access its tracks. This matters because some shippers and receivers are geographically located such that the tracks of only one rail carrier reach their commercial facilities.

Shippers and receivers with physical access to just one railroad are captive to that single carrier, which the Final Rule calls the "incumbent" carrier. The incumbent alone can take that customer's freight from the facility to its destination (or to the limits of the incumbent carrier's rail network) and, as a result, will charge the customer for the entire movement. The incumbent thus holds a monopoly over rail shipments to and from that facility.

Reciprocal switching provides a captive customer with access to an alternate railroad pursuant to an agreement between the incumbent carrier and one of its competitors. When a shipper or receiver relies on a reciprocal switching agreement, the incumbent carrier only takes freight from its point of origin—the customer's facility—to the tracks of another carrier. This movement is called a "switch." From there the freight transfers to a competitor carrier, which completes the transportation to the destination. This longer movement from the switch to the final destination is called the "line haul."

A reciprocal switching agreement can also work in the reverse: after a competitor rail carrier completes the line-haul movement, the freight is then transferred to the incumbent for switching service to the final destination. In either case, the competitor pays the incumbent carrier a fee for the switching service but keeps the greater share of revenue from the customer for the line-haul service.

The Final Rule requires the transfer of freight to occur within a "terminal area"—defined as a "commercially cohesive area in which two or more railroads engage in the local collection, classification, and distribution of rail shipments for purposes of line-haul service." 89 Fed. Reg. 38646, 38677; 49 C.F.R. § 1145.1. And a shipment's point of origin or final destination on the rail system must be within a terminal area to be eligible for a reciprocal switching agreement. See 89 Fed. Reg. 38646, 38676; 49 C.F.R. § 1145.1.

Railroads sometimes voluntarily agree to a reciprocal switching arrangement with another carrier. But absent a Board order, they are not required to do so. The Final Rule establishes a framework under which the Board can compel an incumbent Class I carrier to enter a reciprocal switching agreement with another Class I carrier.

A shipper or receiver with physical access to only one Class I rail carrier (or its affiliated companies) may petition the Board for a reciprocal switching agreement. As relevant here, the petitioner must allege that the incumbent has failed to provide service that meets one or more "performance standards" enumerated in the Final Rule. The Rule contains three performance standards, each intended to assess a different "fundamental aspect[] of adequate rail service": (1) reliability in completing line-haul movements on time;

(2) consistency in how long it takes to complete line-haul movements; and (3) reliability in delivering and picking up railcars at a shipper's or receiver's facility on schedule. 89 Fed. Reg. 38646, 38648.

Under the Final Rule and its regulations, the Board "will prescribe a reciprocal switching agreement" if the agency finds that an incumbent rail carrier has failed to meet one or more performance standards, the failure is not excused by one of the Rule's affirmative defenses, and a reciprocal switching agreement is practicable. *Id.*; 49 C.F.R. § 1145.6(a), (b). The Board will set the length of an initial prescription for between three and five years, with the other terms of the agreement then established by the affected rail carriers. See 89 Fed. Reg. 38646, 38648; 49 C.F.R. § 1145.6(c).

The Board's prescription of a reciprocal switching agreement does not wholly or automatically replace the incumbent carrier. Rather, it simply requires the incumbent to *offer* a switch to a competing Class I carrier, thereby enabling the customer to *choose* between the two rail carriers for line-haul service. See 89 Fed. Reg. 38646, 38655. The customer gains access to an additional carrier while allowing the incumbent to still compete for their business—thus incentivizing the incumbent to improve its service to keep the line-haul movement.

Finally, to provide the Board and customers with the information necessary to ascertain whether a carrier did not meet one of the performance standards, the Final Rule requires Class I carriers to collect and report data related to those standards. See *id.* at 38674–76; 49 C.F.R. § 1145.8. Class I carriers must submit this data to the Board on a weekly basis as well as turn over individualized data related to a particular

shipper's or receiver's traffic upon that customer's request. See 89 Fed. Reg. 38646, 38674–75; 49 C.F.R. § 1145.8(a), (b).

### D

Two Class I carriers (CSX Transportation, Inc. and Union Pacific Railroad Company) and two subsidiaries of another Class I carrier (Grand Trunk Corporation and Illinois Central Railroad Company) challenge the Final Rule. The Administrative Orders Review Act, commonly known as the Hobbs Act, supplies our jurisdiction, governs our judicial review, and provides that any "party aggrieved" by a "final order" of the Board "may, within 60 days after its entry, file a petition to review the order in the court of appeals wherein venue lies." 28 U.S.C. §§ 2321, 2342(5), 2344.

We have an independent obligation to assure ourselves that jurisdiction is secure, and we have no doubt it is. The rail carriers timely petitioned for our review of an appealable final rule. And the Board has not objected to venue. Our attention, then, is on the question of whether these carriers are "part[ies] aggrieved" by the Final Rule. *Id.* § 2344.

The carriers challenging the Final Rule each participated in the Board's notice-and-comment process, which "establishes their party status." *Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.*, 656 F.3d 580, 585 (7th Cir. 2011). Further, these carriers are "aggrieved" because the Final Rule subjects them to data collection requirements and, when certain conditions are satisfied, directs the Board to impose a reciprocal switching agreement upon them. The Hobbs Act requires no more.

With our jurisdiction on solid ground, we can proceed to the merits.

## II

The rail carriers' challenges come on multiple fronts. But their primary contention is that the Final Rule exceeds the Surface Transportation Board's statutory authority in the Staggers Rail Act to prescribe reciprocal switching.

### A

While the Hobbs Act specifies the "form of proceeding for judicial review" of the Board's rules, it is the Administrative Procedure Act that "codifies the nature and attributes of judicial review." *ICC v. Bhd. of Locomotive Eng'rs*, 482 U.S. 270, 282 (1987). By its terms, the APA provides that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be … in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

As presented to us, the rail carriers do not challenge the application of the Final Rule in any particular instance. Indeed, as far as we are aware, the Board has not yet prescribed a reciprocal switching agreement under the procedures adopted in the Rule. The carriers instead seem to challenge the Final Rule more on its face, inviting us to conclude that the Board's promulgation of the Rule itself exceeds the authority Congress conferred in the Staggers Rail Act to order reciprocal switching.

In *Bondi v. VanDerStok*, the Supreme Court recently declined to decide what standard governs a pre-enforcement challenge under the APA where, as here, a party contends that an agency has exceeded its statutory authority. See 145 S. Ct. 857, 866 & n.2 (2025). The Court assumed, but did not resolve, that the proper standard in such cases comes from *INS v. National Center for Immigrants' Rights, Inc.*: the

challenger's "burden is to show that the Rule itself is inconsistent with the statute on its face." *Id.* at 865–66 (quoting Brief for Petitioners at 27–28 (quoting *INS v. Nat'l Ctr. for Immigrants' Rights, Inc.*, 502 U.S. 183, 188 (1991))). The Supreme Court articulated a similar framework in *Reno v. Flores*, 507 U.S. 292, 300–01 (1993). Where a party does not contest a rule's "application in a particular instance," the Court explained there, the challenger "must establish that no set of circumstances exists under which the [regulation] would be valid." *Id.* (alteration in original) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

Two Justices dissented in *VanDerStok*, each expressing concern that applying a "no set of circumstances" test in pre-enforcement challenges to agency rules may, at least in some cases, render it too difficult to conclude that the agency exceeded its statutory authority. See 145 S. Ct. at 881–82 (Thomas, J., dissenting) ("If a regulatory definition survives APA challenge so long as just *one* item it covers also happens to be covered by the statute it purports to interpret, it is difficult to understand how an agency would ever promulgate an invalid definition."); *id.* at 892–94 (Alito, J., dissenting) (explaining that "[a]pplying the *Salerno* rule [on facial challenges] in a case in which a rule is challenged under that provision as exceeding the agency's statutory authority may have far-reaching consequences" and "would represent a huge boon for the administrative state").

We need not wade into this debate today. The parties do not say a word on the point. So we focus, as the majority did in *VanDerStok*, on whether the Final Rule itself is inconsistent with the Staggers Rail Act. In the end, we conclude that it is. The Board exceeded its statutory authority because the Final

Rule, by its terms, deviates from the statutory standards Congress established authorizing reciprocal switching. How we arrive at this conclusion requires an extensive analysis of the statutory scheme, to which we now turn.

B

The Surface Transportation Board is the successor to the now-defunct Interstate Commerce Commission. In 1996 Congress abolished the ICC and transferred its remaining functions, including regulating rail carriers, to the Board. See ICC Termination Act, Pub. L. No. 104-88, 109 Stat. 803; see also 49 U.S.C. § 10501.

Pursuant to what is now codified at 49 U.S.C. § 11102(a), Congress had long authorized the ICC to order one rail carrier to allow another carrier to use a limited section of its tracks—what the statute calls "terminal facilities"—where that use was "practicable and in the public interest." But whether the Commission also had the power to order reciprocal switching remained unclear until 1980. See *Midtec Paper Corp. v. United States*, 857 F.2d 1487, 1500 (D.C. Cir. 1988). It was then, in the Staggers Rail Act, that Congress granted the ICC express statutory authority to prescribe reciprocal switching agreements. See Pub. L. No. 96-448, § 223, 94 Stat. 1895, 1929 (codified as amended at 49 U.S.C. § 11102(c)). As relevant here, the enactment provides that the agency—now the Board—"may require rail carriers to enter into reciprocal switching agreements, where it finds such agreements to be practicable and in the public interest." 49 U.S.C. § 11102(c).

Whether the Final Rule exceeds the scope of the Board's authority in § 11102(c) thus requires us to construe what it means to be "practicable and in the public interest." We

"interpret statutes without deference to the agency's interpretation, using the 'traditional tools of statutory construction,' exercising our 'independent judgment in deciding whether an agency has acted within its statutory authority' while paying '[c]areful attention to the judgment of the Executive Branch,' which 'help[s] inform that inquiry.'" *Gulomjonov v. Bondi*, 131 F.4th 601, 609 (7th Cir. 2025) (alterations in original) (quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 401, 412–13 (2024)).

But in construing what is now § 11102(c), we do not paint on a blank canvas. We interpreted the "in the public interest" provision of the Staggers Rail Act in our 1985 decision in *Central States Enterprises, Inc. v. ICC*, 780 F.2d 664.

In *Central States* we reviewed an ICC decision denying a shipper's petition to require a rail carrier to either share its tracks (pursuant to § 11102(a)) or enter into a reciprocal switching agreement (pursuant to § 11102(c)) with another carrier. See *id.* at 667–68. "[T]o find a reciprocal switching agreement to be in the public interest," the Commission had explained, the agency "would have to find that there was some actual necessity or compelling reason for the agreement." *Id.* at 670. On the facts before it, however, the ICC concluded that there was no actual necessity or compelling reason for the agreement and, therefore, denied the shipper's petition. See *id.* at 670–71.

On appeal the shipper insisted that the Commission had applied the wrong standard to assess whether its request for a switching agreement was "in the public interest." See *id.* at 674, 677. So our decision focused on the proper construction of what constitutes "in the public interest" within the meaning of § 11102(c).

"Both subsections (a) and (c) [of § 11102]," we explained, "provide that the Commission 'may' order relief in the form of a joint use or switching agreement where it is 'practicable and in the public interest.'" *Id.* at 668. And "[w]hen Congress enacted" § 11102(c) in the Staggers Rail Act, we continued, "the Conference adopted that portion of the Senate bill which provided that the practicable and public interest standard to be considered by the Commission 'is [to be] the same standard the Commission has applied in considering whether to order the joint use of terminal facilities [under § 11102(a)].'" *Id.* at 677 (second alteration in original) (quoting H.R. Rep. No. 96-1430, at 116–17 (1980) (Conf. Rep.)); see also S. Rep. No. 96-470, at 42 (1979). So the "practicable and in the public interest" standard, *Central States* concluded, draws its meaning from the ICC precedent that preexisted the Staggers Rail Act. See *id.* at 677–78 & n.18.

Our construction aligned with a longstanding principle of statutory interpretation: where Congress "employs a term of art" with "a long regulatory history," it "brings the old soil with it" and adopts that "prior agency practice." *George v. McDonough*, 596 U.S. 740, 746 (2022) (quoting *Taggart v. Lorenzen*, 587 U.S. 554, 560 (2019)). As applied here, Congress employed in § 11102(c) a term of art—"practicable and in the public interest"—from § 11102(a). Because this term had an accepted meaning from pre-Staggers Rail Act administrative proceedings, it follows that Congress "codified and adopted" that meaning within § 11102(c). *Id.* at 746 (alterations omitted) (quoting *Cook v. Principi*, 318 F.3d 1334, 1344 (Fed. Cir. 2002) (en banc)); see also *United States v. Bd. of Comm'rs of Sheffield*, 435 U.S. 110, 134–35 (1978) (explaining that where "there had been a longstanding administrative interpretation of a statute when Congress re-enacted it" and "the legislative history of

the re-enactment showed that Congress agreed with that in-
terpretation," then "Congress is treated as having adopted
that interpretation").

But there was more to *Central States*, and the more is im-
portant here. Relying on four ICC cases that predated the
Staggers Rail Act, *Central States* determined that a test of
"some actual necessity or compelling reason" is consistent
with the standard the Commission historically employed in
considering whether the joint use of terminal facilities was "in
the public interest" within the meaning of § 11102(a). 780 F.2d
at 677–78 (quoting *Jamestown Chamber of Com. v. Jamestown,
Westfield & N.W. R.R.*, 195 I.C.C. 289, 292 (1933)) (first citing
*Lehigh Valley R.R. Trackage Rights*, 312 I.C.C. 389 (1961); then
citing *Mfrs. Ass'n of York v. Penn. R.R.*, 73 I.C.C. 40 (1922); and
then citing *Hastings Com. Club v. Chicago, Milwaukee & St. Paul
Ry.*, 107 I.C.C. 208 (1926)). In enacting § 11102(c), *Central States*
explained, "Congress stated that in assessing the need for a
proposed switching agreement, the Commission is to apply
the 'same standard [it] … has applied in considering whether
to order the joint use of terminal facilities.'" *Id.* at 680 (altera-
tion in original) (quoting H.R. Rep. No. 96-1430, at 116–17
(1980) (Conf. Rep.)). In the final analysis, then, we had little
difficulty concluding that the "legislative[ly] mandated"
standard to determine whether a reciprocal switching agree-
ment is "in the public interest" within the meaning of
§ 11102(c) is likewise that there must be "some actual neces-
sity or compelling reason" for it. *Id.*

The D.C. Circuit charted a similar course of reasoning a
few years later in *Midtec Paper Corp. v. United States*, 857 F.2d
1487 (1988). Although the court confronted a set of regula-
tions not before us in *Central States*, it concluded—in light of

the Staggers Rail Act's Conference Report—that "the Commission's discretion should be exercised and constrained in like manner under both [§ 11102(a) and (c)]." *Id.* at 1502. And "[h]istorically," the D.C. Circuit observed, "the Commission has required a party requesting terminal trackage rights [pursuant to § 11102(a)] to satisfy the 'practicable and in the public interest' criteria … by demonstrating 'some actual necessity or compelling reason' why such an arrangement should be ordered." *Id.* at 1492 (quoting *Jamestown*, 195 I.C.C. at 291).

## C

Our next step, then, is to give content to the "actual necessity or some compelling reason" standard. And it is at this precise point that the ICC precedent we relied upon in *Central States* becomes important.

In each of the four cases relied on in *Central States*, the ICC had determined that the "public interest" did not necessitate shared use of terminal facilities because the shipper failed to demonstrate the incumbent carrier's rail service was inadequate. See *Jamestown*, 195 I.C.C. at 292 ("The record shows that the [incumbent]'s freight service at Jamestown is not only adequate but is exceptionally good so far as shipments over its lines are concerned. The desirability, but not the necessity, of the additional operation of a joint terminal freight station is shown, but the record does not show that Jamestown shippers are so inadequately served at the present time as to warrant us, from the standpoint of the public interest, to require the [incumbent] to inaugurate additional terminal facilities and share them with [another rail carrier]."); *Lehigh Valley R.R.*, 312 I.C.C. at 392 ("A number of railroads, in combination, can now provide second-morning service between the desired points, and no evidence of inadequate service to the shipping

public by such railroads has been shown. … In such a situation, we cannot find that the public interest requires additional competition in an already adequately served territory."); *Mfrs. Ass'n of York*, 73 I.C.C. at 50 ("There is no showing that the shippers are so inadequately served at present that we are warranted, from the standpoint of the public interest, in depriving the carrier first on the ground of an important volume of the traffic originating along its line, by the direct and affirmative exercise of the power to require the [incumbent rail carrier] to share its terminal facilities with [another carrier.]"); *Hastings Com. Club*, 107 I.C.C. at 217 ("A switch engine is constantly available for the Hastings shippers. Only 14 shippers either ship or receive carload freight, and under normal conditions the record indicates that the [incumbent] affords them a reasonably adequate service.").

In other pre-Staggers Rail Act cases, the Commission similarly declined to prescribe joint use of terminal facilities without a finding that the existing service was inadequate. See, *e.g.*, *Muskegon Ry. & Navigation v. Pere Marquette Ry.*, 148 I.C.C. 653, 661 (1928) (explaining that a carrier is "entitled to serve the industries" located on its own tracks and it is "not in the public interest to require joint use of such tracks" unless the service "is not adequate or impartial"); *City of Hialeah v. Fla. E. Coast Ry.*, 317 I.C.C. 34, 37 (1962) (finding that the public interest did not require joint use of terminal facilities where "[t]here has been no allegation, nor do we believe that a basis exists for an allegation, that shippers are now inadequately served as a result of the method of operation by the [incumbent carrier]"); cf. *Spokane, Portland & Seattle Ry.*, 348 I.C.C. 109, 139–41 & n.20 (1975) (rejecting the "actual necessity or compelling reason" standard based on an overruled ICC decision but then concluding that the evidence "clearly

show[ed] a compelling reason" for terminal access because the "current service" was "clearly inadequate" (citing *Hastings Com. Club v. Chicago, Milwaukee & St. Paul Ry.*, 69 I.C.C. 489, 493 (1922), *rev'd*, 107 I.C.C. 208 (1926))).

*Central States* made the same point by referencing the Staggers Rail Act's legislative history. By enacting § 11102(c), we explained, Congress "provide[d] 'an avenue of relief for shippers where *only one railroad provides service and it[] [i]s inadequate*.'" *Cent. States*, 780 F.2d at 669 (emphasis added) (quoting H.R. Rep. No. 96-1430, at 116 (1980) (Conf. Rep.)).

After Congress enacted § 11102(c), the ICC adhered to much the same construction by similarly requiring a showing of inadequate service to prescribe reciprocal switching. See, *e.g.*, *Cent. States Enters., Inc. v. Seaboard Coast Line R.R.*, No. 38891, 1984 ICC LEXIS 499, at *5 (May 11, 1984) (reversing grant of reciprocal switching agreement where "[the incumbent carrier's] service has not been shown to be inadequate, nor have its rates been shown to be unreasonable"), *aff'd sub nom. Cent. States Enters., Inc. v. ICC*, 780 F.2d 664 (7th Cir. 1985); *Midtec Paper Corp. v. Chicago & N.W. Transp. Co.*, 1 I.C.C.2d 362, 364 (1985) ("[A]n affirmative finding that joint terminal use is in the public interest requires a showing of 'some actual necessity or compelling reason.' … A corollary of this requirement is that it must be shown that existing service is inadequate." (quoting *Jamestown*, 195 I.C.C. at 291–92) (citing *Hastings Com. Club*, 107 I.C.C. at 216)). Indeed, the Commission's own brief in *Central States* described "inadequacy of service" as a necessary "prerequisite for a[n] award of either joint terminal use or reciprocal switching." Joint Brief for the Interstate Commerce Commission and United States of America at 37 n.31, *Cent. States Enters.*, 780 F.2d 664 (No. 84-

2005). "[T]he shipper[]," the ICC urged in our court, bears the "burden of demonstrating some compelling need, such as a clear inadequacy of service, before the Commission will require a carrier to turn its operating property or traffic originating on its line over to another carrier." *Id.* at 38 (citing *Mfrs. Ass'n of York*, 73 I.C.C. at 49–50).

Another point of our statutory analysis warrants emphasis. At times, the Final Rule and the parties before us describe the "some actual necessity or compelling reason" standard as a "compelling need" test. Our opinion in *Central States* used this same shorthand. See 780 F.2d at 678 & n.18. For the avoidance of any doubt, the precise standard *Central States* interpreted § 11102(c) to require was put in the disjunctive—requiring "some actual necessity or compelling reason" for a reciprocal switching agreement. *Id.* at 680. But nowhere does *Central States* state, much less suggest, that these two formulations have independent and different meanings, with one setting a higher standard than the other. Nor do we see any point in looking for daylight between them. Quite to the contrary, we have drawn upon *Central States*'s interpretation of § 11102(c) and concluded that the statutory provision requires a threshold finding of inadequate service by the incumbent rail carrier.

### D

The Board urges a different statutory analysis, joined by several associations of freight rail shippers who intervened to defend the Final Rule.

The Board contends that in evaluating whether to prescribe reciprocal switching, § 11102(c)'s "in the public interest" requirement, requires not a threshold finding of

inadequate service by an incumbent carrier, but instead a balancing of the respective interests of the affected carriers, shippers, and public at large.

We cannot get there, for the Board offers an incomplete account of what § 11102(c) demands. In particular, the Board is mistaken in asking us to interpret the statutory language without regard to the "actual necessity or some compelling reason" test, which we concluded in *Central States* is the "legislative[ly] mandated" standard that emerged from the ICC's pre-1980 administrative precedent. 780 F.2d at 680. The Board also inadequately accounts for the role that a finding of inadequate rail service played in those ICC adjudications—a necessary "prerequisite," as the Commission represented to us in *Central States*. Joint Brief for the Interstate Commerce Commission and United States of America, *supra*, at 37 n.31.

Taking a different tact, the Board contends that the ICC's administrative case law used the phrase "actual necessity or some compelling reason" merely to inform what would be required, in some circumstances, to strike a fair balance of interests. But § 11102(c), the Board insists, does not require a threshold showing of any current service problems to be "in the public interest" within the meaning of that statute.

To be sure, the Board's position does find some support in ICC precedent. In several cases relied on by the intervening shippers associations, the Commission balanced whether the benefits of regulatory intervention outweighed the detriments and, from there, ordered reciprocal switching or joint use without describing any discrete problems with the existing rail service. See, *e.g.*, *Port Arthur Chamber of Com. v. Texarkana & Fort Smith Ry.*, 136 I.C.C. 597 (1928); *Chicago & N.W. Ry. v. Ann Arbor R.R.*, 263 I.C.C. 287 (1945); *Del. & Hudson Ry. v.*

*Consol. Ry.*, 367 I.C.C. 718, 730–31 (1983) (Sterrett, Vice Chairman, dissenting) ("In considering whether the [petitioner's] proposal is in the public interest, neither the Commission nor the review board found that [the incumbent's] present service in Philadelphia is inadequate.").

But these precedents are both limited and overwhelmed by others. Put another way, it is hardly surprising that, on a handful of occasions throughout the decades, the Commission—as a multi-member body with varying policy preferences—reached results not entirely aligned with one another. Having taken a hard look at the totality of the history, we conclude that the weight of the ICC's administrative precedent—and particularly the pre-Staggers Rail Act precedent that Congress codified within § 11102(c)—points in one direction: a finding of inadequate service functioned as a prerequisite to regulatory intervention. So a construction of the statute that merely considers, as one aspect of a balancing test, whether the existing rail service is inadequate, but does not require such a finding, rests on legal infirmity.

### III

#### A

What all this history tells us is that the statute authorizing the Surface Transportation Board to order reciprocal switching, 49 U.S.C. § 11102(c), requires "some actual necessity or compelling reason" to do so. And we interpret this standard, as we have emphasized, to demand evidence that the service provided by the incumbent carrier is inadequate. Stated more directly, the inadequacy of the existing service is a necessary finding the Board must make before it can impose a reciprocal switching agreement.

Having determined what § 11102(c) requires, we can now examine whether the Final Rule exceeds the Board's statutory authority. If the Rule permits the Board to impose a reciprocal switching agreement in the absence of a finding of inadequate service by an incumbent carrier, then the answer to that question is yes.

B

We begin by observing that the Final Rule explicitly rejects the "some actual necessity or compelling reason" standard. See 89 Fed. Reg. 38646, 38648–52. This test, the Board tells us, "rest[s] on a misinterpretation of the public interest standard in section 11102(c)." *Id.* at 38649; see also *id.* at 38681 n.56 ("[The] carriers have misstated the law in suggesting that the Board must find a compelling need as a condition to a prescription under section 11102(c)."). We cannot agree. Indeed, it is the Board that has misinterpreted § 11102(c) and our construction of that provision in *Central States*.

For more than 80 years it has been a foundational principle of administrative law that agency action "may not stand if the agency has misconceived the law." *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) ("[I]f the action is based upon a determination of law as to which the reviewing authority of the courts does come into play, an order may not stand if the agency has misconceived the law."); see also *NLRB v. Brown*, 380 U.S. 278, 292 (1965) ("Courts must, of course, set aside [agency] decisions which rest on an 'erroneous legal foundation.'" (quoting *NLRB v. Babcock & Wilcox Co.*, 351 U.S. 105, 112–13 (1956)).

We stop short of vacating the Final Rule on this basis alone, however, for the Board presses an argument in the alternative. "[E]ven if a compelling need were required under

the public interest standard in section 11102(c)," the Board urges, the Final Rule "would meet that standard" because it "promotes adequate rail service both by introducing an alternate rail carrier via an appropriately defined and scoped reciprocal switching agreement when there have been *sufficient indications of service issues* … and by more broadly creating an incentive for rail carriers to provide adequate service." 89 Fed. Reg. 38646, 38652 (emphasis added).

In advancing this argument, the Board necessarily recognizes that the adequacy of an incumbent's service is at least relevant to determining whether a reciprocal switching agreement is "in the public interest" within the meaning of § 11102(c). See *id.*; see also *id.* at 38648 ("There is a clear public interest in adequate rail service—a matter of fundamental concern under the Interstate Commerce Act."). And undoubtedly the purpose of the Final Rule is to "promote the provision of adequate rail service." *Id.* at 38648. Its very title—Reciprocal Switching for Inadequate Service—confirms as much.

But how does the Final Rule promote adequate rail service? The Board suggests the Rule's three performance standards serve as the triggering mechanism to determine whether service is inadequate and, in turn, that prescription of a reciprocal switching agreement furthers the public interest. These performance standards, the Final Rule states, "address three fundamental aspects of adequate rail service: reliable timing in the arrival of line-haul shipments, consistent shipment times, and on-time local pick-ups and deliveries." *Id.* "The standards," the Board adds, "are set at levels such that performance below the standards would not meet many shippers' (and carriers') service expectations." *Id.* And "as a condition

to regulatory intervention," the Final Rule continues, "there must be sufficient indications, in the form of the incumbent carrier's failure to meet a service-based performance standard and the absence of an affirmative defense or demonstration of undue impairment, that the introduction of an alternate rail carrier via a[] … switching agreement prescription could be valuable in bringing about better rail service." *Id.* at 38650.

But here is where the Final Rule departs from what § 11102(c) requires. "[T]he performance standards," the Rule states, "do not define what constitutes adequate rail service." *Id.* at 38647. The Board then doubles down on this statement in its brief, telling us that, in devising the performance standards "the Board declined to predict what would constitute 'inadequate rail service' in any given circumstance." And it is "incorrect," the agency continues, "to suggest that failure to meet a performance standard in [the Final Rule] represents a regulatory determination of inadequate service."

On this point, the Final Rule is at odds with itself. The whole objective of the Board's regulatory action, dating back to its April 2022 hearing, was to improve rail service that the agency deemed inadequate. Nevertheless, the Board now concedes that the Final Rule's three performance metrics—around which the entire scheme authorizing the prescription of a switching agreement is built—do not correspond with a finding that an incumbent rail carrier's service is inadequate. And we must take the Board at its word. See *Apogee Coal Co. v. Off. of Workers' Comp. Programs*, 113 F.4th 751, 759 (7th Cir. 2024) ("[A]gency action must be judged on the reasoning given by the agency at the time of its decision." (citing *Chenery Corp.*, 318 U.S. at 87–88)).

For the Board's position to make any sense, the performance standards, necessarily, must measure something less than the adequacy of an incumbent's existing rail service, thereby creating daylight between the level of service that causes a carrier to fail one of the performance standards and the separate, more critical and statutorily required determination that the level of service it provides is inadequate. But the Final Rule never captures—and never hinges prescription of a reciprocal switching agreement on—the full measure and finding of inadequate service.

During the notice-and-comment period, one rail carrier argued that, "because there is no compelling need for a switching prescription where a service inadequacy no longer exists," the Board "should only permit petitions for alleged service inadequacies that are 'reasonably contemporaneous with the petition and exist at the time of the petition.'" 89 Fed. Reg. 38646, 38681 n.56 (citation omitted). But the Board rejected this proposal. It would "undermine the purposes of [the Final Rule]," the agency explained, "to require demonstration of an ongoing service issue." *Id.* So the Final Rule "does not require demonstration of an ongoing service issue as a condition to a prescription." *Id.* Indeed, a carrier can be subject to a reciprocal switching agreement even after curing the deficiency that led the shipper to file the petition in the first place. See *id.* at 38686.

What this means is that the Final Rule, by its very terms and the Board's own admission, does not require a showing of inadequate service by an incumbent carrier before it authorizes reciprocal switching. Because we have interpreted the statutory standard of "in the public interest" in § 11102(c)

of the Staggers Rail Act to require such a finding, the Board's concession all but defeats its position before us.

C

At the risk of repetition, the Final Rule expressly states that "the performance standards do not define what constitutes adequate rail service." *Id.* at 38647. But perhaps the Final Rule could be saved if another component of its regulatory framework ensures that the Board will not impose reciprocal switching absent a finding of inadequate service.

Recall that, under the framework established by the Final Rule, the Board "will prescribe a reciprocal switching agreement" where the incumbent rail carrier fails to meet one or more performance standards, the failure is not excused by one of the Rule's affirmative defenses, and a reciprocal switching agreement is practicable. *Id.* at 38709; 49 C.F.R. § 1145.6(a), (b). With the Board representing that the performance standards do not define what constitutes adequate rail service, this leaves the affirmative defenses and practicability requirement. Yet nothing in the text of the Final Rule suggests that either criterion evaluates the adequacy of the existing service.

Begin with the affirmative defenses. The Final Rule provides that an incumbent rail carrier "shall be deemed not to fail a performance standard if the carrier demonstrates that its apparent failure to meet a performance standard was caused by conditions that would qualify as an affirmative defense." 89 Fed. Reg. 38646, 38685; see also 49 C.F.R. § 1145.3. The affirmative defenses thus do not measure a rail carrier's service but rather are designed to—as the very words affirmative defense suggest—provide the incumbent with an opportunity to explain there is some cause *other* than its own service that

excuses a shortcoming in performance. See 89 Fed. Reg. 38646, 38685 ("As a general matter, the Board's specified affirmative defenses are focused on reasons that a carrier's service might be below a metric during the relevant 12-week period."). Even more specifically, the regulations accompanying the Final Rule enumerate five defenses, which contemplate circumstances such as natural disasters, third-party conduct, and substantial increases in the shipper's traffic. See 49 C.F.R. § 1145.3. But none of them allow the incumbent to present evidence that they provide adequate service to the petitioning shipper or receiver. See *id.*

True enough, the Board has said it will consider additional affirmative defenses "on a case-by-case basis." *Id.* But we fail to see how an incumbent carrier could use this provision to avoid a reciprocal switching agreement on the ground that their existing rail service is adequate. During notice and comment, one carrier proposed language that would require the Board to consider "any defense relevant to whether there is a service inadequacy for which there is actual necessity or compelling reason for a prescribed switching agreement." 89 Fed. Reg. 38646, 38685 (citation omitted). Yet the Board rejected this proposal too, concluding that there is "less value" in affirmative defenses that "focus on whether there is a service inadequacy with certain largely undefined effects based on allegations of a petitioner's particularized service needs or whether the carrier cured the cause of its failure to meet a performance standard." *Id.* at 38686. We therefore have no basis to conclude that an incumbent carrier can avoid a reciprocal switching agreement by establishing as a defense that they provide adequate service to the petitioning shipper or receiver.

The practicability constraint fares no better. The regulations accompanying the Final Rule provide that "the Board will not prescribe a reciprocal switching agreement if the incumbent rail carrier or alternate rail carrier demonstrates that the agreement is not practicable." 49 C.F.R. § 1145.6(b). Practicability is then defined in terms that speak solely to the operational feasibility of transferring shipments between the incumbent and an alternate carrier. See *id.*

No one suggests that measuring whether reciprocal switching is "practicable" requires an assessment of the adequacy of an incumbent rail carrier's service. For good reason. Remember that § 11102(c) requires a switching agreement to be *both* "practicable *and* in the public interest." 49 U.S.C. § 11102(c)(1) (emphasis added); see also *Cent. States*, 780 F.2d at 676 (explaining that, pursuant to § 11102, the petitioner "must demonstrate that the requested reciprocal switching agreement is both 'practicable' and in the 'public interest'"). So in resolving whether the Board has satisfied the "public interest" requirement of the statute, it is of little consequence that the Final Rule separately ensures any prescribed agreement will be "practicable."

With all of this recognized, the answer to the question before us becomes yet more certain: nothing in the Final Rule assures us that the Board will only impose a reciprocal switching agreement in circumstances where the incumbent's rail service is inadequate. Indeed, the Final Rule's text confirms that inadequate service is not a prerequisite to prescription, and the Board has reinforced the shortcoming by declining to adopt an affirmative defense relating to the adequacy of existing rail service.

Stepping back, consideration of the Final Rule has no doubt immersed us in a complicated regulatory and statutory scheme. And that scheme is informed by an equally complicated history of ICC administrative adjudications. But do not let that two-fold complexity overwhelm. We have determined that the statute authorizing the Board to prescribe reciprocal switching requires a finding of inadequate service, and this necessary finding is unambiguously missing from the Final Rule. That outcome reflects legal infirmity.

Because the process the Final Rule provides to obtain a reciprocal switching agreement does not include a determination of whether an incumbent carrier's rail service is inadequate, we conclude that the Final Rule, by its terms, is inconsistent with the Board's statutory authority under § 11102(c).

## D

The Board urges us to overlook this defect in the Final Rule's procedures, assuring us that any decision to order reciprocal switching will be made on a case-by-case basis. A rail carrier flunking a performance standard, the agency presses, does not automatically result in a prescription—it merely initiates an involved process in which the Board can and will consider and balance all relevant factors.

But the Final Rule specifically forecloses the individualized determination that the agency claims it enshrines. Nowhere does the Final Rule contemplate the Board weighing the interests of the parties, taking testimony on the adequacy of the existing rail service, evaluating whether the introduction of a competing carrier could be beneficial, and, from there, exercising its discretion to either prescribe reciprocal switching or refrain from doing so. To the contrary, the

agency "*will prescribe* a reciprocal switching agreement" where the incumbent rail carrier fails to meet one or more performance standards, that failure is not excused by one of the Rule's affirmative defenses, and a reciprocal switching agreement is practicable. 89 Fed. Reg. 38646, 38648 (emphasis added); 49 C.F.R. § 1145.6(a), (b) (emphasis added). Further, on the critical question before the Board—the adequacy of existing service—the Final Rule announces that the agency does not require an ongoing service issue as a condition to prescription and, moreover, has rejected a corresponding affirmative defense. Any latitude the Board retains for a case-by-case inquiry in connection with other considerations cannot overcome this legal deficiency.

In the end, we are left with no choice but to vacate the Final Rule.

## IV

Our decision that the Final Rule exceeds the Board's statutory authority to prescribe reciprocal switching under § 11102(c) obviates the need to consider the rail carrier's challenges to other aspects of the Rule. Yet we still owe them a brief word.

The carriers contend that the Final Rule's three performance standards are arbitrary, capricious, and unsupported by the record. But this dispute pulls us into complex detail regarding the Board's selection of each of the three metrics. And any conclusion we reach might be advisory, as the Board may reevaluate these standards in light of our decision and the arguments made on appeal, should it decide to re-promulgate the Rule on remand.

That leaves us with the challenge to the Final Rule's requirement that Class I carriers collect and report certain performance data. The carriers urge that this aspect of the Rule exceeds the Board's ancillary powers conferred in its enabling statute, 49 U.S.C. § 1321. Resolving this question is complicated by the Board's failure in the Final Rule to rely expressly on its statutory authority under § 1321(b)(3), which grants the Board authority to "obtain from those carriers and persons information the Board decides is necessary to carry out [49 U.S.C.] subtitle IV"—the subtitle that includes its power to prescribe reciprocal switching. Further, the rail carriers made sound points on appeal regarding the need for a non-disclosure agreement or protective order in connection with confidential information—points that the Board did not disagree with. The Board may well revisit this component of the Final Rule too on remand. But we refrain from deciding today whether the disclosure requirements, as written, exceed the agency's statutory authority.

\* \* \*

For these reasons, we GRANT the petition, VACATE the Final Rule, and REMAND to the Board for further proceedings.